UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA      )
      )
      )      Case No. 1:04-CR-133
v.      )      Collier/Lee
      )
JEROME THOMAS BUFORD      )

## REPORT AND RECOMMENDATION

### I. Introduction

Defendant Jerome Thomas Buford ("Buford") has filed a motion to suppress the allegedly prejudicial identification of Buford while he was seated in the back seat of a patrol car on May 28, 2004 [Doc. No. 18]. The motion has been referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Buford contends the unnecessarily suggestive identification procedures used in the "showup" identification of May 28, 2004, have so unfairly tainted the identification process that all evidence concerning the identification and identification process should be excluded under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. For the reasons stated herein, it is **RECOMMENDED** that Buford's motion be **DENIED**.

### II. Relevant Facts

The court held an evidentiary hearing on Buford's motion to suppress on October 5, 2005. During the hearing, the government offered the testimony of Jessica Nopper ("Nopper") and Chattanooga Police Officer William Tallant ("Tallant"). Buford offered the testimony of Chattanooga Police Officer Chad Bradley ("Bradley").

*Jessica Nopper's Testimony*

Nopper testified that on May 28, 2004, she was working as a manager at the City Café Diner at 901 Carter Street in Chattanooga. The diner is connected to the Days Inn Hotel in downtown Chattanooga. Nopper has worked there for approximately two and one-half years.

At about 1:30 A.M., a man – later identified as Buford – asked Nopper for change for a dollar. Nopper stated there was nothing unusual about Buford's request since there was a pay phone located just outside the diner and people frequently asked for change to use the telephone. Buford pulled out a Harley Davidson wallet, which Nopper observed was attached to his jeans by a chain. Nopper opened the cash register thinking Buford was about to give her a dollar. Buford then stated he had a gun and Nopper saw the gun in his hand. Buford told Nopper not to say anything or she would be shot and he told her to give him "all the green." Nopper responded she did not understand what Buford wanted and he told her to give her to give him all of the "paper" in the register.

While this was going on, Nopper was trying to get the attention of the customers who were seated near the cashier's station, but Buford was holding the gun in such a position that the customers in the diner could not see it. The counter at the cashier's station is approximately two feet wide and the gun in Buford's hand was hidden by the counter from the view of the customers. Nopper gave Buford the money from the cash register and he ran out the door. She screamed she had just been robbed and called 911.

The front of the diner, where the cashier's station was located, was well-lit. Nopper estimated Buford was approximately an arm's length away from her during the robbery. Because of the distance, and because the area around the cashier's station was well-lit, she was able to get a good look at Buford. Nopper described Buford as wearing a black "do-rag," a black leather vest

2

and either blue or black jeans. She also described the gun carried by Buford as having a cylinder and being either dark brown or black.

As Nopper called 911, two servers who were working in the diner, Kevin Malcolm ("Malcolm") and Edward Webster, ran into the parking lot after Buford. Nopper also went into the parking lot after she finished calling 911. Buford's car was parked in the back of the lot and he had to circle completely around the diner to get to his car, which is why Nopper believes he was still in the parking lot when she finished her 911 call. Malcolm had taken a wooden crate used for deliveries with him into the parking lot and he threw the crate at the car in an attempt to impede the escape. Nopper saw the getaway car driving away as she exited the diner. Although Nopper saw the vehicle exit the parking lot, she was unable to see the license plate or driver. However, Malcolm did get the license plate number and he called 911 on his cellular telephone and reported the license plate number.

After the getaway car left the parking lot, Nopper went back into the diner and waited for a police response. Within 30 minutes of the robbery, Tallant arrived and obtained a description of the robber from Nopper. He told Nopper the robbery suspect had been captured in the vicinity of the restaurant and he was going to take her to the scene of the arrest to identify the robber. At the scene of Buford's arrest, Nopper stayed in Tallant's patrol car because she was terrified of the robber and she did not want him to see her. Nopper was seated in the front passenger seat of the vehicle and Tallant stood just outside the vehicle. Tallant turned on the headlights and take-down lights on his vehicle facing Buford so Buford could not see Nopper. Buford was told to step out of the police vehicle in which he was being held. Nopper told Tallant Buford was the man who robbed her.

Nopper testified she was able to see and identify Buford in the lights of the patrol car. She

could not remember if he was wearing the "do-rag" at the time of her identification, but he was handcuffed. Nopper stated she was able to identify Buford because he had the bright lights of the police vehicles shining on him, but the identification was more difficult under those circumstances than if it had occurred in normal sunlight or indoor lighting because it was dark. Nopper estimated her identification of Buford occurred approximately 40 to 45 minutes after the time of the robbery.

Nopper testified Buford did not use a cane and he was able to run from the diner after the robbery. When asked approximately how fast Buford was able to run, Nopper stated he was able to run quick enough to get out of the door. Nopper also stated there was video surveillance of the cashier's station in the diner, but she did not know if the police had the video.

### Officer William Tallant's Testimony

Tallant, a Chattanooga Police Officer for three years, is a patrolman assigned to patrol the downtown Chattanooga area on the midnight shift. He had the same assignment on May 28, 2004. On that night, he responded to a call about a robbery at the City Café Diner. Tallant was on another call when he received the dispatch about the robbery and, by the time he arrived at the diner, Buford had already been apprehended approximately one-eighth of a mile from the diner.

When Tallant arrived at the diner he told Nopper the police had someone in custody and they needed her to come to the scene of the arrest to determine if she could identify that individual as the robber. Tallant gathered the facts about the robbery from Nopper including the description of the robber, and then he took her to the scene of Buford's arrest to identify Buford. Tallant stated Nopper gave him a very specific description of Buford, including what Buford was wearing and the gun. Tallant described the cashier's station at the diner as being well-lit. Nopper told Tallant she was only two or three feet away from the robber during the robbery. Tallant believes he also told

4

Nopper that the person in police custody matched the description she provided of the robber.

Tallant took Nopper to the scene of the arrest for the purposes of identification because the police wanted to know if they had the right person in custody. Tallant had not seen Buford prior to their arrival on the scene, however, he stated when he saw Buford, everything matched Nopper's description of the robber. It took a few minutes to set up the viewing and, as Nopper sat in the front seat of the patrol car, Tallant turned his headlights and take-down lights on bright. He stated this would have a blinding effect on the person standing in the light and he did this because Nopper was terrified and did not want Buford to see her. Buford then was positioned standing in front of the police car. Nopper remained seated in the front passenger seat of the patrol car and Tallant stood outside. Buford was turned in several directions so Nopper could see him, and she immediately identified him as the robber. Tallant estimated no more than 45 minutes had elapsed from the time of the robbery to the time Nopper identified Buford as the robber.

Tallant stated the Chattanooga Police Department conducts three types of lineups: formal lineups, photographic "six pack" lineups, and "showup" lineups immediately after an offense has taken place. Tallant testified there were no exigent circumstances which required the "showup" identification be conducted in the manner it was conducted. Buford was already in custody and under arrest on charges of evading arrest and aggravated assault and was not going to be set free so it would have been possible to bring Nopper in to conduct a lineup.

### *Officer Chad Bradley's Testimony*

Bradley, also a Chattanooga Police Officer, was involved in a car chase with Buford soon after the robbery. After the police received a 911 call about the robbery, and based on the license plate information, the suspect's vehicle was spotted heading west on Main Street toward the

5

riverfront.  As the police were chasing and attempting to capture Buford, he turned into a narrow

alley and his vehicle hung up on a high curb.  Bradley pulled his patrol car into the alley side-by-side

with another police cruiser as trained for a "felony take-down".  Buford exited the vehicle with a

revolver in his hands.  Another police officer at the scene yelled "drop it, drop it," and then fired

shots when the gun was not dropped.  Buford got back into his vehicle, began revving the engine

in reverse and started backing the vehicle toward the police.  At the time Buford reentered the

vehicle, it was approximately six feet in front of four police officers.  As Buford pulled backward

toward the officers while revving the engine, all four officers fired some 24 shots at Buford's

vehicle.  Buford began driving his vehicle forward, but his vehicle was blocked.  Buford exited the

vehicle and began to run from the scene.  After a short foot pursuit, Buford was captured by the

police.  A gun and money were recovered from Buford's vehicle.

## **III. Analysis**

Due process requires the exclusion of testimony of a pretrial identification when the

identification procedures were unnecessarily suggestive and conducive to a mistaken identification

which cannot be repaired.  *United States v. Hill*, 967 F.2d 226, 229 (6th Cir.), *cert. denied*, 506 U.S.

964 (1992) (citing *Stovall v. Denno*, 338 U.S. 293, 301-02 (1967)).  A showup identification, which

is the "'practice of showing suspects singly to persons for the purpose of identification, and not as

part of a lineup, has been widely condemned.'"  *Id.* at 230 (quoting *Stovall*, 388 U.S. at 302).

However, testimony concerning an identification based on unnecessarily suggestive procedures will

not be excluded if the totality of the circumstances indicates the evidence is reliable.  *Id.* (citing *Neil*

*v. Biggers*, 409 U.S. 188, 199 (1972)).  The Supreme Court has developed a two-step analysis

regarding the admissibility of identification evidence.  First, the defendant has the burden of

6

establishing that the identification procedure was impermissibly suggestive. *Id.* Second, if the defendant establishes impermissibly suggestive identification procedures were used, the trial court must determine, based upon the totality of the circumstances, whether the evidence of the identification is reliable. *Id.* The Supreme Court has set forth five factors which must be considered for the evaluation of reliability:

> (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that ha[d] elapsed between the crime and the confrontation.

*Id.* (citing *Neil*, 409 U.S. at 199-200). Under the totality of the circumstances test, reliability "' is the linchpin in determining the admissibility of identification testimony.'" *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

In its responsive brief [Doc. No. 23] and at the October 5, 2005 suppression hearing, the government essentially conceded Nopper's showup identification of Buford involved an unnecessarily suggestive procedure. Thus, the sole remaining issue presented by Buford's motion to suppress is whether, under the totality of the circumstances, Nopper's identification of Buford is reliable. After considering the five factors set forth by the Supreme Court in *Neil*, I find Nopper's identification of Buford is reliable and due process does not require the exclusion of testimony of her identification.

The first, second and third factors, Nopper's opportunity to view Buford at the time of the crime, her degree of attention at the time of the crime, and the accuracy of her prior description of Buford, weigh in favor of reliability. Nopper had an excellent opportunity to view Buford as he robbed her standing only two or three feet from her in front of the cash register, in a well-lit area.

7

They conversed when Buford first asked Nopper for change for a dollar and again during the robbery when Buford told Nopper to give him "all the green" and then explained he wanted the "paper" money. Nopper paid attention noting Buford had a Harley Davidson wallet attached to his jeans by a chain. She also paid attention once he pulled a gun and told her not to yell for help or she would be shot. Nopper gave an accurate description of the clothes Buford was wearing and the description was accurate enough that Tallent testified when he saw Buford for the first time, everything matched Nopper's description of the robber.

The fourth factor, Nopper's level of certainty when identifying Buford, also weighs heavily in favor of a finding of reliability. Nopper was readily able to identify Buford when she saw him approximately 45 minutes after the robbery. During her testimony, Nopper acknowledged she could not recall if Buford was still wearing the "do-rag" at the time of her identification, and she also admitted the identification in the dark under the bright lights of the police cruisers was more difficult than if she had identified Buford in sunlight or in normal indoor lighting. Despite the shortcomings of the situation in which the showup identification occurred, and having had the opportunity to observe Nopper's demeanor and listen to her testimony during the suppression hearing, I find her identification of Buford as the person who had robbed her to be reliable.

While Nopper's identification of Buford did not take place under the most optimal lighting conditions and Nopper could not remember whether Buford was still wearing the black "do-rag" at the time of her identification, these are factors the jury may consider in determining how much weight to accord Nopper's testimony. "'As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given to the identification.'" *Hill*, 967 F.2d at 230 (quoting *United States v. Causey*, 834 F.2d 1277, 1285 (6th

8

Cir. 1987)). It is for the jury to determine whether Nopper's identification of Buford should be accorded less weight because it may have occurred under less than optimal conditions.

During the suppression hearing, Buford's counsel argued that the lighting conditions affected the quality of Nopper's identification of Buford because, among other things, in the bright lights from the police cruisers she may or may not have been able to notice whether Buford had any gray hair. However, Nopper stated during the robbery, Buford wore a black "do-rag" on his head. Nopper credibly testified she was able to identify Buford as the robber, despite not being able to remember whether he was wearing the "do-rag" at the time of her identification. Thus, it is unlikely whether if Buford had any gray hair factored into Nopper's identification. By the time Nopper saw Buford some 40 to 45 minutes after the robbery, Buford had been apprehended by the police following a chase, the firing of multiple gunshots at Buford and a short foot pursuit. Thus, it is entirely within the realm of possibility that Buford may not have been wearing the "do-rag" when Nopper identified him. Likewise, Tallant may have told Nopper the police had apprehended someone who matched the description of the robber prior to the identification does not render Nopper's identification so unreliable as to require its exclusion. It may, however, be another factor for the jury to consider in determining how much weight to accord to Nopper's identification of Buford as the robber.

The fifth and final factor, the length of time which elapsed between the robbery and Nopper's identification of Buford, also weighs heavily in favor of reliability. *See Manson v. Brathwaite*, 432 U.S. 98, 100 (1977). Nopper's identification of Buford as the robber occurred less than one hour after the robbery. In *Manson*, an undercover officer, Glover, purchased heroin from the defendant, Brathwaite. Glover drove to his headquarters and, about eight minutes after the heroin purchase,

described Brathwaite, who Glover did not know, to another police officer, D'Onofrio. *Id.* at 101. From Glover's description, D'Onofrio suspected Brathwaite was the heroin seller and he obtained a photograph of Brathwaite and left it at Glover's office. *Id.* at 101. Two days later, Glover viewed the photograph for the first time and identified Brathwaite as the seller of the heroin. *Id.* Following his conviction in state court, Brathwaite filed a *habeas corpus* petition alleging the admission of Glover's identification testimony during his state trial deprived him of due process of law. *Id.* at 103. The Supreme Court noted it was conceded the identification procedure was suggestive because only one photograph was used and unnecessary because there was no emergency or exigent circumstances, but denied Brathwaite's petition after applying the five factor analysis set forth in *Neil* finding there was not a substantial likelihood of misidentification by Glover. *Id.* The Supreme Court held the facts surrounding the identification of Brathwaite properly had been left for the jury to weigh. *Id.* at 116.

Similar results were reached in *United States v. Lebron Cepeda*, 324 F.3d 52 (1st Cir.), *cert. denied*, 540 U.S. 892 (2003), where a witness, Martinez, observed a red car with a missing bumper come to an abrupt stop. Three men, including defendant Caraballo, who had just been involved in a carjacking and murder, exited the vehicle and walked toward a nearby housing project. *Id.* at 56. Believing the actions of the three men to be suspicious, Martinez went to his residence and called the police. *Id.* Martinez learned of the carjacking and murder and he returned to the parked red car and waited for a police officer to arrive. Martinez gave the officer a description of the three men and pointed out the housing project where they had been headed. *Id.* Caraballo was arrested a short time later in the housing project. *Id.* Within minutes of Caraballo's arrest and without any request from the police, Martinez arrived at the scene of the arrest and identified Caraballo as one of the

three men about whom he had called police. *Id.* at 58. Caraballo challenged Martinez's identification of him on the grounds the procedure used was impermissibly suggestive and there was a substantial likelihood of misidentification because Martinez had seen Caraballo handcuffed and sitting in a police cruiser prior to the identification. *Id.* at 58-59. The trial court found Martinez's identification should not be excluded because it was "contemporaneous with the events that the witness had seen only a few minutes before" and because Martinez had provided the information which led to Caraballo's arrest. *Id.* at 59. The reviewing court concluded the trial court permissibly allowed the jury to hear about Martinez's identification. *Id.* Given the short time which elapsed in this case between the time of the robbery and Nopper's identification of Buford as the robber, I similarly conclude the fifth factor also weighs heavily in favor of reliability. *See Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005) ("Three months is not a great length of time between an observation and identification."). *See also United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987) ("A three to four-month delay between the crime and the identification does not render the identification inherently unreliable.").

As all five factors weigh in favor of the reliability of Nopper's identification of Buford, I conclude due process does not require the exclusion of evidence of Nopper's identification of Buford as the person who robbed the City Café Diner.

## IV. Conclusion

For the reasons stated herein, it is **RECOMMENDED** that Buford's motion to suppress

[Doc. No. 18] be **DENIED**.[1]


s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).